[No. F070761. Fifth Dist. Mar. 17, 2017.]

CHARITY FAITH PHILLIPS et al., Plaintiffs and Respondents, v.
HONEYWELL INTERNATIONAL INC., Defendant and Appellant.

**COUNSEL**

Horvitz & Levy, Lisa Perrochet, Robert H. Wright, Curt Cutting; Perkins Coie, Brien F. McMahon and Daniel D. O'Shea for Defendant and Appellant.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Respondents.

**OPINION**

**FRANSON, J.**—Defendant Honeywell International Inc. (Honeywell) appeals from a judgment of over $5.8 million awarded to the spouse and surviving children of a man who died of asbestos-related cancer. The jury found the mesothelioma contracted by James Lester Phillips (Phillips) was caused in part by exposure to asbestos contained in Bendix brakes.

Honeywell contends a new trial is warranted because: (1) the jury's special verdict was fatally inconsistent; (2) the trial court erroneously refused to give its proposed jury instruction on the factors relevant to causation; and (3) the trial court erroneously admitted prejudicial evidence. Moreover, Honeywell contends judgment should be entered in its favor because the verdict was based entirely on a failure to warn theory that lacked sufficient evidentiary support. If judgment is not entered in its favor, Honeywell contends the $3.5

million award of punitive damages must be reversed because plaintiffs failed to introduce sufficient evidence of malice or oppression.

In the published portion of this opinion, we reject Honeywell's claims of evidentiary error. The trial court properly admitted—subject to a limiting instruction—a 1966 letter of a Bendix employee sarcastically addressing an article in Chemical Week magazine that stated asbestos had been accused, but not yet convicted, as a significant health hazard. The letter is circumstantial evidence relevant to the issue of Bendix's awareness of asbestos's potential to cause cancer. The Illinois and Florida cases holding admission of this letter was prejudicial are distinguishable because they did not include a limiting instruction.

In addition, the trial court properly admitted the testimony of plaintiffs' expert about causation and the contributions to Phillips's risk of cancer from every identified exposure to asbestos that Phillips experienced. In the context of this case, the every-identified-exposure theory is distinguishable from the every-exposure theory and we join courts from other jurisdictions in recognizing that distinction. Furthermore, we conclude the application of every-identified-exposure theory in this case was consistent with California law addressing proof of causation in asbestos-related cancer cases. Consequently, we need not address the every-exposure theory that the Second District allowed to be presented to the jury in *Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477 [199 Cal.Rptr.3d 583], review denied May 25, 2016 (*Davis*),[1] and Honeywell's contention that this court should split with *Davis*.

In the unpublished portion of this opinion, we reject Honeywell's other contentions. First, the jury's answers to questions in the special verdict about causation are not inconsistent. Second, the trial court properly rejected Honeywell's proposed instruction about the factors relevant to causation of asbestos-related cancer. Third, as to the sufficiency of the evidence, we conclude there was adequate evidentiary support for the jury's findings that (1) Honeywell was liable under a failure to warn theory and (2) Honeywell's predecessor, Bendix, acted with malice—that is, a willful and conscious disregard of the safety of others. (Civ. Code, § 3294, subd. (c)(1) [definition of malice].)

We therefore affirm the judgment.

---

[1] The court in *Davis* concluded that the trial court did not abuse its discretion in allowing the plaintiff's medical expert to present opinion testimony under the every-exposure theory. (*Davis, supra*, 245 Cal.App.4th at p. 480.) The court reviewed the commentary and scientific literature cited by the parties, concluded "the theory is the subject of legitimate scientific debate," and stated it was for the jury to resolve the conflict among the competing expert opinions. (*Ibid.*)

## FACTS

*Bendix and Asbestos*

In 1939, The Bendix Corporation (Bendix) began manufacturing friction products, including automotive brakes, that contained asbestos.[2] Until 1983, Bendix manufactured its brakes using 25 to 50 percent asbestos with other ingredients bound in a resin. In 1983, Bendix began offering asbestos-free brakes for some vehicles but continued to manufacture and sell asbestos-containing brakes until 2001.

Bendix operated a manufacturing facility in Troy, New York. By 1944, Bendix had installed a ventilation system at the facility to assist in the removal of dust. Also, duct work was hooked up to grinding machines to remove the grinding dust from the workplace. Sometime during the 1950's, Bendix began giving employees at the facility annual chest X-rays.

In 1956, New York's Department of Labor adopted regulations setting a maximum allowable concentration for airborne asbestos at five million particles per cubic foot. These regulations applied at Bendix's Troy plant.

In March 1966, the New York Times published an article titled, *Asbestos Dust Called a Hazard to at Least One-fourth of U.S.* The title's reference to a quarter of the pollution was described as a preliminary finding by Dr. Irving J. Selikoff, who announced the establishment of an environmental health laboratory at Mount Sinai Hospital to further investigate the dangers of asbestos and other contaminants. The article mentioned Dr. Selikoff's finding of a link between cancer and asbestos in asbestos workers and his belief that the dangers extended to contiguous trades, such as construction workers. The article also stated that asbestos was used in fireproof materials, asphalt tile, dental cement, brake linings, beer filters, gas masks, and paper.

Later in 1966, the publication of *Asbestos: Awaiting Trial* (Sept. 10, 1966) Chemical Week, at page 32, caused E.A. Martin, director of purchases at Bendix's Troy facility, to write a now infamous letter to Bendix's asbestos supplier (Martin letter). The letter was dated September 12, 1966, and addressed to Noel Hendry of Canadian Johns-Manville Asbestos Limited (Johns-Manville) at Asbestos, Quebec, Canada.[3] A box appearing immediately above the article's title listed sources of airborne asbestos, including

---

[2] "In 1985, Allied Corporation purchased Bendix. Later, Allied Corporation changed its name to Allied Signal, Inc., and in 1999 changed it to Honeywell International, Inc." (*Dukes v. Pneumo Abex Corp.* (2008) 386 Ill.App.3d 425, 428 [326 Ill.Dec. 881, 900 N.E.2d 1128, 1131] (*Dukes*).)

[3] The Chemical Week article, Martin's letter, and Hendry's September 29, 1966, reply are discussed in Castleman, Asbestos: Medical and Legal Aspects (5th ed. 2005) page 534.

"Motor vehicle brake linings and clutch plates." The contents of the Martin letter are quoted in full in part III.A.1., *post*. The Martin letter plays a role in this appeal because Honeywell contends its admission into evidence was prejudicial error.

Honeywell's corporate representative testified that in 1973 Bendix began placing a warning on the cartons for asbestos-containing brake pads. The warning label used the exact language prescribed by newly enacted OSHA regulations and was placed on the side of the box so it would be visible when the boxes were stacked. The warning stated: "Caution: Contains asbestos fibers, avoid creating dust. Breathing asbestos dust may cause serious bodily harm."

In December 1975, Jacob W. Tawiah presented Bendix with a review of the medical literature addressing the health hazards of asbestos. The executive summary of the review stated that medical knowledge at that time associated asbestos with three primary diseases: asbestosis, lung cancer, and mesothelioma, a rare form of cancer that is the most deadly of the three. It also described the general agreement that the diseases are positively correlated to the intensity and duration of exposure to asbestos dust, but noted "there is no conclusive proof of a safe threshold level of exposure." The summary stated that there have been cases of mesothelioma that cannot be linked to asbestos, but exposure to asbestos dust is the only known cause of mesothelioma. The commentary section of the executive summary stated: "The medical literature is full of solid evidence linking asbestos to disease. Eliminating the emission of asbestos dust into the working environment appears to be an obvious way of dealing with the problem. This, however, may not be the most feasible approach in light of economic considerations. It then becomes necessary to examine what other alternatives exist." Many of the references listed at the end of the review predate the 1970's.

*Asbestos*

The term "asbestos" is applied to six different types of naturally occurring mineral fibers. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 177, fn. 2 [202 Cal.Rptr.3d 460, 370 P.3d 1022] (*Webb*).) When mined and processed, asbestos generally is separated into thin fibers that are then mixed with a binding agent so the fibers may be used in various products. (*Ibid.*)[4] The individual fibers are invisible to the naked eye. (*Webb*, at p. 177, fn. 2.)

---

[4] Asbestos was used by the ancient Greeks, Romans, and Charlemagne. (See Comment, *The Threshold Level of Proof of Asbestos Causation: The "Frequency, Regularity and Proximity Test" and a Modified* Summers v. Tice *Theory of Burden-Shifting* (1995) 24 Cap. U. L.Rev. 735, 737 [Roman slaves wore transparent bladder skins as veils to avoid inhaling asbestos dust]; Comment, *Issues in Asbestos Litigation* (1983) 34 Hastings L.J. 871, 872, fn. 7.)

The six types of asbestos are divided into two groups, amphibole and serpentine. The only member of the serpentine group used in a commercial setting is chrysotile, which was the type used in Bendix brakes. The amphibole family contains the other five types, of which amosite and crocidolite are used commercially. The differences between the two groups was explained during the trial and Honeywell argued Phillips's mesothelioma was caused by his exposure to asbestos fibers from the amphibole group, not chrysotile fibers from Bendix brakes.

The different types of asbestos have different physical properties and different chemical makeups. As to shape, chrysotile tends to be curved (i.e., spiral) and thin compared to the straight, thin structure of amphibole asbestos. The physical and chemical differences affect both the human body's ability to clear the fiber and the fiber's toxicity—that is, the likelihood the fiber will cause disease.

In this case, the term "biopersistence" was used to refer to the capacity of asbestos fibers to persist over time in specific tissues of the body and retain their chemical and physical features. Underlying the use of this term is the testimony that the longer a fiber remains in the tissue and retains the characteristics of asbestos, the higher the risk that it will induce adverse health effects.

Carl Andrew Brodkin, M.D., testified as plaintiffs' medical expert. Dr. Brodkin stated amphiboles last longer in the human body, with a half-life measured in months or years, while the half-life of chrysotile is measured in weeks or months. Nonetheless, Dr. Brodkin stated his opinion that: (1) all of the major types of commercial asbestos fibers are known to cause cancer, in both the lung and the lining of the lung; (2) amosite and crocidolite are about three times more potent than chrysotile in causing mesothelioma;[5] and (3) persons exposed to chrysotile have far higher rates of mesothelioma than individuals who are not exposed. In contrast, a Honeywell expert, Richard L. Attanoos, M.D., testified that chrysotile-containing friction products, such as brakes, do not cause mesothelioma. Another Honeywell expert, David Weill, M.D., testified that available medical literature and cohort studies showed that individuals working with chrysotile products did not have an elevated risk of mesothelioma. Dr. Weill distinguished the risk from lower exposures experienced by people who work with chrysotile products from the risk of higher exposures experienced by workers who mine chrysotile.

---

[5] The experts who testified in *Webb, supra,* 63 Cal.4th 167, presented a range of opinions about the relative risk of contracting mesothelioma after exposure to crocidolite and chrysotile. "One expert opined that crocidolite presents five times the risk of chrysotile asbestos . . . and conceded crocidolite might present a risk as high as 10 times the toxicity of chrysotile. A second expert opined that crocidolite is 500 times as toxic, and testified that others estimated its risk to be 800 times has high." (*Id.* at p. 194 (conc. & dis. opn. of Cantil-Sakauye, C. J.).)

Dr. Attanoos explained his opinion that brakes do not cause mesothelioma by stating that: (1) the asbestos in brakes is chrysotile, not amphibole, and chrysotile has a low biopersistence; (2) the chamfering done before brakes are installed releases fibers encapsulated in resin that do not have the normal respirability; (3) the brake dust created by the braking process contains only about 1 percent chrysotile because the friction of braking creates very high temperatures that breaks down the chrysotile into a noncarcinogenic material called forsterite; and (4) the chrysolite remaining in brake dust tends to be very small in size.

Dr. Brodkin agreed the heat of braking causes a breakdown of asbestos fiber into forsterite and "[t]here is no evidence that forsterite causes disease." He testified the studies of brake dust that found less than 1 percent residual asbestos were at the low end of the range and referred to other studies finding 5, 6, and 15 percent residual asbestos in brake dust.

*Mesothelioma*

Mesothelioma is a relatively rare cancer that occurs in the lining of the lung, which is called the pleura. (*Webb, supra,* 63 Cal.4th at pp. 194–195 (conc. & dis. opn. of Cantil-Sakauye, C. J.).) As the cancer grows, it "will eventually entrap the entire lung, creating the tightening effect of a corset by preventing the lung from expanding. The cancer also grows outward into the chest wall where it irritates nerve roots, creating pain. People with mesothelioma live, on average, 12 to 14 months." (*Id.* at p. 195 (conc. & dis. opn. of Cantil-Sakauye, C. J.)

Our Supreme Court recently described mesothelioma as a cancer "closely associated with asbestos exposure." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1141 [210 Cal.Rptr.3d 283, 384 P.3d 283]; see *Moran v. Foster Wheel Energy Corp.* (2016) 246 Cal.App.4th 500, 503 [200 Cal.Rptr.3d 902] [mesothelioma is "a cancer uniquely associated with exposure to asbestos"]; Hoffheimer, *California's Territorial Turn in Choice of Law* (2015) 67 Rutgers U. L.Rev. 167, 191, fn. 125 [research report of National Cancer Institute cited for propositions that by "1988, asbestos was identified as the only known risk factor for mesothelioma" and the time lag between exposure and developing mesothelioma usually is 30 to 40 years].)

Dr. Brodkin testified that mesothelioma is a dose-response disease, which means the greater the dose of asbestos, the greater the risk for the disease. Dr. Brodkin's testimony about the causal connection between the asbestos exposures identified in this case and Phillips's mesothelioma is set forth in part III.B.4., *post.*

Mesothelioma (in contrast to asbestosis) is not a cumulative disease in the sense that each inhalation of asbestos generates a certain amount of disability.

(Stapleton, *The Two Explosive Proof-of-Causation Doctrines Central to Asbestos Claims* (2009) 74 Brook. L.Rev. 1011, 1023.) The more a person is exposed to asbestos, the more likely asbestos-related cancer will occur, but once the cancer occurs its severity does not depend upon the amount of asbestos to which the victim was exposed. (*Id.* at pp. 1023–1024.) Also, mesothelioma is "indivisible in the sense that it is beyond our current abilities to ascertain which asbestos fiber(s) caused the illness." (Sanders, *The "Every Exposure" Cases and the Beginning of the Asbestos Endgame* (2014) 88 Tul. L.Rev. 1153, 1161.) This characteristic underlies our Supreme Court's conclusion in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*) that "[i]n an asbestos-related cancer case, the plaintiff need *not* prove [asbestos] fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth." (*Id.* at p. 982.) Instead, our Supreme Court adopted a special rule allowing plaintiffs to prove exposure to the defendant's product was a substantial factor in causing the cancer by showing (in a reasonable medical probability) the exposure was a *substantial factor contributing to the decedent's risk of developing cancer.* (*Ibid.*)

*Phillips's Exposure to Asbestos*

Phillips was born in September 1953. In 1967, Phillips had a summer job where he learned how to change brakes. In 1969, 1970, and 1971, while in high school, Phillips worked as an attendant and mechanic at gas stations in Mariposa. While employed at the gas stations, he performed many tasks, including brake jobs. In addition to the brake jobs at the gas stations, Phillips performed brake jobs on his own vehicles and the vehicles of friends.[6] Phillips did brake jobs throughout the 1970's and 1980's, right up to the time he was diagnosed with mesothelioma.

When asked if he could quantify the number of vehicles on which he did brake work, Phillips answered, "No. A lot." Asked again during his deposition, Phillips stated, "I couldn't count them. Quite a few." Phillips identified the brands of brakes he installed or removed as Raybestos, Rayloc, Wizard, Bendix, and Vapex. He was aware of the brand because it was printed on the box and stamped on a metal part of the brake. Phillips described the steps he took when installing Bendix brakes as follows: "Take it out of the package, clean them up. You want to scuff the shiny stuff off with sandpaper, you know, if you have some rough 80 [grain sandpaper], and chamfer the edges. Remove the old brakes, install the new brakes with the springs and stuff—the new brake drums with the springs and stuff—the new brake pads with the

---

[6] Phillips owned roughly 40 vehicles over his lifetime. Honeywell summarized his deposition testimony by stating Phillips was able to recall changing brakes on 21 vehicles, which he identified by make and model.

springs. Clean all the dirt out, blow all the dust off, and then install the new brakes, and put the drum back on, and then you readjust the brakes up until the drum stops moving and back it off 13 clicks, and put your tires on it."

Phillips also stated that the cleaning process involved the use of compressed air to blow the dust out of the brake drum, which was messy but worked well.

In 1972, at the age of 19, Phillips was employed as a maintenance worker by Mariposa County High School. Phillips held that job for one year. He sometimes worked at a bench in a room that housed a boiler and insulated steam pipes. Phillips also worked directly with insulation. When a valve on the steam heating system malfunctioned, Phillips or his boss would fix the valve and then Phillips would remove any affected insulation, do the necessary cleanup, and replace the pipe's insulation. He also remembered removing insulation from a storage tank and rewrapping the tank with new insulation. Phillips testified that he assumed the insulation contained asbestos. Plaintiffs' expert, Dr. Brodkin, testified the insulation was likely to contain asbestos and estimated its content at 12 to 50 percent. Dr. Attanoos testified thermal insulation from that period would have contained amphibole asbestos. The jury allocated 15 percent of the fault to boiler insulation, impliedly finding the insulation contained asbestos.

During Phillips's employment at the high school, he also worked on a project that involved the installation of asbestos cement pipe, which he called transite pipe.[7] Phillips estimated that he installed approximately 120 linear feet of the pipe and cut the pipe about 40 times using a snap cutter, Skilsaw with carborundum blade, or a handsaw. Phillips stated he did about half the cuts with the Skilsaw, which he described as messy.

In 1973, Phillips began working as a plumber. He worked about seven years for Hudson's Plumbing, followed by a year at Posey Plumbing. In the late 1980's, he returned to Hudson's Plumbing for another four years. Phillips testified that he worked with asbestos cement pipe while at Hudson's Plumbing.

Phillips worked a brief stint with the Mariposa Public Utility District and then was employed by a construction company. One of the construction company's projects involved the removal of water and sewer lines at Yosemite National Park, some of which were asbestos cement pipe. The jury allocated 23 percent of fault to asbestos-containing cement pipe.

---

[7] In *Webb*, the court stated that Johns-Manville "made an asbestos cement pipe known as Transite pipe. Although 'Transite' was trademarked by Johns-Manville, the name became a generic term for all brands of asbestos cement pipe." (*Webb, supra*, 63 Cal.4th at p. 178.)

Additional exposures to asbestos occurred when Phillips did repair and maintenance work on vehicles he owned or friends owned, such as (1) the installation of clutches and (2) the removal and installation of gaskets, particularly on carburetors. Phillips testified he learned how to perform a clutch job when he was 14 or 15 years old and did his last clutch job about two years before his 2012 deposition. He stated he could not count the number of clutch jobs he did, but described some of the vehicles he worked on, including a 1966 Chevelle Super Sport that he and his wife used to drag race and required 13 new clutches. The jury allocated 9 percent of the fault to clutches and 5 percent to automotive gaskets.

In March 2012, Phillips was diagnosed with mesothelioma. He died in February 2013.

## PROCEEDINGS

In May 2012, Phillips and his wife, Charity Faith Phillips, filed a complaint seeking damages for personal injuries caused by asbestos. In May 2013, after Phillips's death, Charity Phillips, individually and as the personal representative of his estate, filed a first amended complaint alleging negligence and strict liability. Three of their children were added as plaintiffs and asserted claims for wrongful death.[8] For purposes of this opinion, "plaintiffs" refer to Phillips's wife and the three children.

The first amended complaint named over 25 defendants engaged in the manufacture or supply of products containing asbestos. Defendant Honeywell, formerly known as AlliedSignal Inc., was sued individually and as the successor in interest to Bendix, a manufacturer of automotive brakes. Bendix brakes were among the asbestos-containing products to which Phillips was exposed.

Plaintiffs settled with most of the defendants and the matter proceeded to trial against Honeywell and Calaveras Asbestos Ltd. Calaveras Asbestos Ltd. was granted nonsuit during the jury trial. As a result, Honeywell was the only defendant remaining in the case when it was presented to the jury.

*Jury's Findings as to Liability*

In May 2014, the jury completed a special verdict form that addressed plaintiffs' negligence claim and three separate theories of strict liability. As to negligence, the jury expressly found: (1) Phillips had been exposed to asbestos

---

[8] Phillips and Charity were married in 1972. Their youngest child was 30 years old at the time of Phillips's deposition in September 2012.

from Bendix brakes; (2) Bendix was negligent in manufacturing or selling asbestos-containing brakes; and (3) Bendix's negligence was a substantial factor in causing harm to Phillips.

Plaintiffs' other successful legal theory was strict liability based on the failure to warn. The jury found: (1) Bendix's asbestos-containing products had potential risks that were known or knowable in light of the generally accepted scientific and medical knowledge that was available at the time of sale; (2) the potential risks of Bendix's asbestos-containing products presented a substantial danger to persons using or misusing the product in an intended or reasonably foreseeable way; (3) ordinary consumers of the products would have failed to recognize the potential risks; (4) Bendix did not adequately warn or instruct consumers of the potential risks; and (5) the lack of sufficient warnings or instructions on Bendix's asbestos-containing products was a substantial factor in causing harm to Phillips.

Plaintiffs were unsuccessful on their strict liability theories based on (1) a risk-benefit analysis of the product's design and (2) consumer expectations. The jury answered "no" when asked if the risks of Bendix's design outweighed the benefits of the design. As to consumer expectations, the jury found that Bendix's products failed to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way. However, the jury also found that the design of the products was not a substantial factor in causing harm to Phillips.

The jury was asked to allocate the fault that caused harm to Phillips among eight sources. Those sources and the jury's percentage allocation were Bendix (30 percent), asbestos-containing cement pipe (23 percent), brakes from other manufacturers (15 percent), boiler insulation (15 percent), clutches (9 percent), automotive gaskets (5 percent), joint compound (3 percent), and mastic (0 percent).[9]

*Actual Damages*

The parties stipulated to economic damages of $900,000. The amount of noneconomic damages was decided by the jury. It found Charity Phillips's noneconomic losses were $5.55 million and the three children experienced noneconomic losses of $329,500 each. Thus, plaintiffs' noneconomic damages totaled $6,538,500.

---

[9] "Mastic" refers to a paste-like material spread before the installation of tiles or other flooring. Exposure to asbestos can occur while installing new flooring or while removing old flooring and the mastic holding it in place. When in his early teens, Phillips removed the vinyl flooring in a laundry room so new flooring could be installed. The job involved scraping the old mastic off the floor, which Phillips accomplished using a wire brush and spatula. The jury's finding as to mastic implies it did not accept or apply the every-exposure theory challenged by Honeywell. (See pt. III.B., *post.*)

*Punitive Damages*

The jury's special verdict included a finding that, based on clear and convincing evidence, one or more of Bendix's officers, directors or managing agents acted with malice or oppression in the conduct upon which the finding of liability was based. Based on this finding, the trial proceeded to a punitive damages phase. The jury awarded $3.5 million in punitive damages.

*Judgment and Appeal*

The damages were adjusted by the trial court to reflect (1) the jury's allocation of fault to other causes and (2) the settlements paid to plaintiffs by other defendants. The settlements totaled $4,041,750. The court determined Honeywell was liable for $1,961,550 in noneconomic damages (i.e., 30 percent of $6,538,500), $414,990 in economic damages, and $3.5 million in punitive damages.

On September 17, 2014, the trial court entered a judgment holding Honeywell liable for $5,876,540. In October 2014, Honeywell filed a notice of appeal challenging the judgment.

## DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Evidentiary Error*

A. *Martin Letter*

1. *Contents of Letter*

Plaintiffs offered as an exhibit the Martin letter, which was dated September 12, 1966, and addressed to Noel Hendry at Johns-Manville, the company that supplied asbestos to Bendix.[12] The body of the Martin letter stated:

"Just to be sure you have a copy, an article that appeared in Chemical Week magazine is [e]nclosed. [¶] So that you'll know that Asbestos is not the

---

*See footnote, *ante*, page 1061.

[12] The Johns-Manville asbestos mine in Quebec has been described by our Supreme Court as one of the world's largest sources of chrysotile asbestos. (*Webb, supra*, 63 Cal.4th at p. 178.)

only contaminate, [*sic*] a second article from O.P. & D Reporter assess[es] a share of the blame on trees.

"My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause."

The parties characterize the sarcasm in the final paragraph differently. Plaintiffs argued its shows a Bendix employee was aware that exposure to asbestos could cause death. Honeywell interpreted the letter as "nothing more than a sarcastic expression of confidence in a product ingredient by a corporate employee who was not an officer, director or managing agent of Bendix."

### 2. Proceedings Involving the Letter

Before trial, Honeywell filed a motion in limine requesting the Martin letter be excluded on the grounds it was inadmissible hearsay, unauthenticated, irrelevant, and highly prejudicial. On the first day of the trial proceedings, the trial court heard argument on the motion and, the next day, informed counsel of its ruling. The court stated it would admit the Martin letter "in its present form, with a limiting instruction that the only use of the document is whether or not that document put . . . Bendix . . . on notice of the danger of asbestos." The court allowed the document to be presented as evidence contradicting Honeywell's position that Bendix did not become aware of the dangers associated with asbestos until later in the 1960's or in the 1970's.

Pursuant to its ruling, the trial court gave a limiting instruction about the purposes for which various documents, including the Martin letter, could be used by the jury. The limiting instruction was given prior to the closing arguments of counsel and stated: "Ladies and gentlemen, you have heard about and seen certain documents from the Friction Materials Standards Institute (FMSI), Bendix, Johns-Manville, the Asbestos Information Association, news media, and other sources. You may consider those documents and the statements contained in those documents only in deciding the issue of whether Bendix had notice of matters discussed in the statements and for impeachment. [¶] Those specific documents will be Exhibits 783, 376, 792, 793, 874, 799, 808, 149, 810, 822, 2722, and 2723 and be contained in a separate binder. [¶] You may not use the documents and statements as independent proof that the statements in those documents are true."[13]

In his opening statement, counsel for plaintiffs referred to the Martin letter, stating "it's going to be hard to dispute that Bendix knew before Mr. Phillips

---

[13] The Martin letter was designated trial exhibit No. 783.

ever touched a brake that asbestos can cause disease and can kill you. We're going to prove that. [¶] Bendix admits people will die from asbestos. September 12th, 1966. We will show that to you, that they had knowledge. They knew that asbestos fibers could kill." Counsel continued by listing other dates to the jury, stating: "October 16th, 1966, Bendix knows that asbestos is linked to cancer. [¶] January 7th, 1969, Johns-Manville tells Bendix asbestos causes mesothelioma. Johns-Manville was a supplier of asbestos fibers to Bendix."

The jury heard the last paragraph of the Martin letter during the presentation of a video deposition of Honeywell's corporate representative, Joel Cohen. During that deposition, plaintiffs' counsel asked about when Bendix first had an indication that asbestos could cause disease. Cohen stated, "I can tell you that in 1968 [Bendix] did receive this letter [from Johns-Manville], and I believe that's what put [Bendix] on notice."

During closing argument, plaintiffs' counsel referred to Cohen's testimony and challenged the accuracy of Cohen's date of notice by stating: "You saw this letter; right? [¶] September 12th, 1966. This is E.A. Martin's letter, the director of purchasing at the New York plant." Counsel then read the final paragraph of the letter and stated: "They knew. They knew. 1966. What is it, '68 or '66? The facts changed. They got to be forthright with you. That's what a reasonable company does. [¶] So were they negligent? Yes. The answer to question 2 [on the special verdict form], we feel we've shown enough to show that they were negligent; okay?"

Later in his closing argument, plaintiffs' counsel again quoted the final paragraph of the Martin letter to support his argument that Bendix "knew in 1966 that asbestos could kill. They knew that." Counsel asked, "what's the significance of 1966? It's one year before James Phillips ever touches a brake. They knew."

Honeywell's counsel also addressed the Martin letter in his closing argument. He quoted the trial court's limiting instruction and then stated:

"Now let me talk about the E.A. Martin letter. [¶] This is a letter that you heard read, and essentially it's from a purchasing agent. Yes, he calls himself director of purchasing. He's not a director of the corporation. He's not a corporate director. He's not a CEO. He's not a CFO.

"This is—essentially, this letter is like that one bad e-mail that all of us has written at one time. Is it fair to judge an entire company based on one letter from someone who orders supplies? That's what the question is for you.

"What he did is he bought raw asbestos from a supplier. He makes no references to brakes. What he's saying, if you read the letter, is he's saying, 'I

know. Everyone's talking about asbestos lately. We're not concerned.' He makes a joke. He says, you know, maybe the problem is trees or something; who knows. And he's making a sarcastic comment. The sarcastic comment is, huh, you know, you made a good living from asbestos; you might as well die from it.

"He's talking about himself. He made a good—in part he's talking about himself. He made a good living from asbestos. He's—the joke is, the sarcastic remark—it's like saying boy, is it cold out here on a day like today when it's nice and hot. He's saying the opposite. He's saying we're not worried about it like, yes, as if we're worried about it.

"And that, again, is not evidence of any notice of a problem with brakes. It's a discussion of raw asbestos used in the plant, no discussion about brakes."

In his rebuttal, plaintiffs' counsel responded to Honeywell's argument that Martin's letter was a sarcastic comment or a joke sent to a buddy, by stating "that's a terrible joke to make if you're buying asbestos and selling it. That's a terrible joke to make."

Also, during the punitive damages phase of the trial, plaintiffs' counsel repeated his argument about the Martin letter showing Bendix knew asbestos was hazardous in 1966. Honeywell's counsel responded as follows:

"So let's talk about the E.A. Martin letter. E.A. Martin, larger than life, a letter written or reportedly written in September of 1966, to a colleague at Johns-Manville, the same company that three years later said that their research indicated there was no problem from a health perspective with asbestos in brakes, is writing in response to an article that appeared in a magazine. And he does make the statement, if he wrote the letter, 'If you have enjoyed a good life while working with asbestos products, why not die from it.'

"Mr. Martin was a director of purchases. He wasn't a member of the board of directors of the Bendix Corporation. He wasn't an officer of the corporation. He wasn't a manager of the corporation. You've seen no evidence that anyone at the Bendix Corporation saw this letter, acted in response to this letter, did anything to approve or ratify the comments that were made, these personal comments, if they were made, of Mr. Martin. And you see that this letter is not signed, and that there's handwriting on the letter. But if he wrote the letter, there's nothing to indicate that anyone at Bendix did anything in a malicious or oppressive way or reprehensible way, with knowledge of that letter.

"Mr. Martin, you really have heard no evidence about Mr. Martin, other than he was a director of purchases for a facility. He bought asbestos from a supplier. He was not responsible for health and safety of the Bendix Corporation. You certainly heard no evidence about that. But this letter is used as the re[e]d on which to build the case for the punitive damage award that's being sought in this case. [¶] That letter doesn't rise to that level."

Plaintiffs' counsel's final summation to the jury responded to Honeywell's argument about the Martin letter and emphasized what evidence had been presented and what evidence was not presented. Counsel stated, "You have tangible pieces of evidence of what Bendix knew and what they did. And what you don't have is an explanation as to why. And they chose in this case not to bring anybody to explain that." Counsel illustrated this point by stating that no evidence was presented as to what Bendix's health and safety director did from 1966 through 1975.

### 3. *Authentication*

Honeywell's appellate briefing does not raise the lack of authentication as a separate issue on appeal and does not cite Evidence Code section 1400, which governs the authentication of writings.[14] We note, however, Honeywell's briefs state that it challenged the admission of the Martin letter in the trial court on the ground the letter was not authenticated. For purposes of clarity, we state why authentication is not an issue addressed in this opinion. Specifically, the statements in Honeywell's brief were insufficient to raise the issue of authentication for purposes of this appeal.

By rule, an appellant's brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) When a potential issue or argument is not presented to an appellate court in a separate heading or subheading, that issue or argument is deemed forfeited. (*Foster v. Britton* (2015) 242 Cal.App.4th 920, 928, fn. 6 [195 Cal.Rptr.3d 800]; see *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [87 Cal.Rptr.3d 187] [purpose of rule].)

Here, the admission of the Martin letter into evidence is challenged by Honeywell on the grounds stated in the following heading: "The trial court erroneously admitted the Martin letter, which was not relevant and unduly prejudiced the jury against Honeywell."[15] (Boldface omitted.) Based on the

---

[14] "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)

[15] The exact same heading appears in Honeywell's opening brief and its reply brief.

contents of the briefs, the rule of court, and the case law applying that rule, we conclude Honeywell has not challenged the authentication of the Martin letter in this appeal.

### 4. Relevancy: Governing Principles

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." "Relevant evidence" is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

■ Relevant evidence includes *circumstantial* evidence that tends to establish a fact from which the existence or nonexistence of the fact in issue can be inferred. (*Firlotte v. Jessee* (1946) 76 Cal.App.2d 207, 210 [172 P.2d 710].) The modifier "circumstantial" is used to emphasize the need to draw inferences from the evidence. (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 1, p. 358.) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).)

### 5. Analysis of Relevancy

Honeywell contends the Martin letter "was clearly irrelevant. It did not establish that Bendix had notice of any material fact." Honeywell also complains that the Martin letter was introduced into evidence without the enclosed article, stating: "The enclosed article referred only to medical conditions not at issue here (asbestosis and lung cancer) and said nothing about any risks known, or even suspected, from the small amounts of chrysotile asbestos in brake dust."

Ordinarily, arguments about whether circumstantial evidence is relevant to the litigation are structured by (1) identifying a disputed material fact and (2) analyzing whether the evidence in question reasonably supports an inference about the existence or nonexistence of that disputed fact. Here, Honeywell's arguments do not accurately complete the first step and, lacking this grounding, fail to demonstrate that the Martin letter had no relevancy to any of the disputed material facts.

The first step—identifying disputed material facts—begins with an examination of the allegations made in the first amended complaint. Paragraph 7 of

plaintiffs' first amended complaint alleged defendants negligently and carelessly researched the health hazards of their products. Paragraph 8 of the first amended complaint alleged defendants breached a duty to exercise reasonable care by failing to investigate the hazards of their product and by failing to warn of the health hazards of using their products. These allegations about the failure to research or investigate health hazards raises a question about when Bendix became aware of facts that would cause a reasonable person to conduct a further inquiry into the safety of its products. Therefore, we conclude that when Bendix became aware (i.e., had notice) of facts that would cause a reasonable person to conduct a further inquiry is a disputed material fact in this litigation.

The dispute continued beyond the pleading stage and became more specific by the time it was presented to the jury. Plaintiffs contended that in 1966 Bendix was on notice of potential health hazards that should have triggered further research and investigation. This timing was disputed by Cohen, Honeywell's representative, when he testified that a 1968 letter from Johns-Manville first put Bendix on notice that asbestos could cause disease. Therefore, the dispute about the material fact of notice extended to whether Bendix was aware of potential health hazards in 1966.

■ The second step of our inquiry considers whether the Martin letter reasonably supports an inference that Bendix's management was aware of the potential health hazards of airborne asbestos before 1968. We conclude the Martin letter reasonably supports an inference about Bendix's awareness and, therefore, the letter is relevant circumstantial evidence. (*Honeywell Internat., Inc. v. Guilder* (Fla.Dist.Ct.App. 2009) 23 So.3d 867, 870 (*Guilder*) [Martin letter "was relevant to proving Honeywell's knowledge of the dangers of asbestos in its products"].) As to foundational matters, the jury reasonably could have found that Martin drafted the letter and was aware of the magazine article about asbestos. Next, the jury reasonably could infer that (1) questions about the safety of asbestos were known generally within the asbestos industry and (2) Bendix's management was not more ignorant than Martin about these questions, which had serious business implications for a company selling asbestos products. Thus, the trial court did not abuse its discretion in determining the Martin letter was relevant circumstantial evidence.

Honeywell's attempt to bolster its argument of irrelevancy by stating the attached article said nothing specifically about small amounts of chrysotile or about brake dust is unconvincing. The article was not presented to the jury, but is part of the appellate record. The article (1) addressed the dangers of airborne asbestos, (2) referred to the impact of airborne asbestos on "all Americans, . . . even though most of them never worked directly with

asbestos," (3) mentioned chrysotile was the form of asbestos that held the predominant market position, and (4) included a list of the sources of airborne asbestos that referred to motor vehicle braking linings and clutch plates. The article's actual references to chrysotile asbestos and brake linings in connection with the hazards presented by airborne asbestos encompassed contradicts Honeywell's argument that the article was irrelevant to its product and, therefore, the Martin letter was irrelevant to the potential health hazards associated with its brakes. In short, Honeywell's argument that it needed information very specific to brakes and chrysotile before it could become aware of potential health hazards of its product is as unconvincing to us as it was to the jury.

As to the relevance of the sarcastic last paragraph, its reference to dying from asbestos tends to prove that the author was aware that the article was asserting a causal connection between the exposure to airborne asbestos and health impacts that could result in death. The possibility that the author believed the assertions were false or wildly exaggerated does not undercut his awareness that assertions were being made about potential health hazards. The knowledge or awareness that assertions about health impacts serious enough to cause death was relevant to plaintiffs' allegation that Bendix breached the duty of reasonable care by failing to investigate the hazards of its products. For example, plaintiffs' counsel argued to the jury: "A reasonable company should research the *potential* health hazards of their products. That's reasonable." (Italics added.) Counsel supported this argument by referring to deposition testimony of Eugene Rogers[16] stating he did not know if Bendix ever spent any money on the health effects of asbestos during any timeframe. Therefore, we reject Honeywell's argument that the last paragraph of the Martin letter "had nothing to do with 'notice.' "[17]

In summary, we conclude that the Martin letter was circumstantial evidence relevant to the issues identified in the trial court's limiting instruction, which restricted use of the letter and other documents to "whether Bendix had notice of matters discussed in the statements and for impeachment." In other words, the existence of the Martin letter made it more probable, rather

---

[16] Rogers started working part time for Bendix in 1944 and, after receiving his master's degree in chemical engineering, began working full time in July 1951 as a resin development chemist. Rogers received many promotions during the course of his employment with Bendix, including promotions to quality control manager (1956), assistant factor manager (1963), supervisory engineer for materials and processes, senior staff engineer (1980), and manager of product engineering (1981). The deposition of Rogers was taken in 1984, while he was still employed by Bendix.

[17] The term "notice" has many definitions. (See Black's Law Dict. (9th ed. 2009) pp. 1164–1165.) In this case, it was used by plaintiffs to refer to what Bendix knew. For example, the reporter's transcript contains many instances where, in reference to the notice issue, plaintiffs' counsel addressed what Bendix knew and argued Bendix "knew that asbestos fibers could kill."

than less probable, that Bendix's management was aware of the questions being raised about the safety of asbestos.

### 6. *Prejudice: Governing Principles*

■ The admissibility of relevant evidence is subject to various statutory exceptions. (Evid. Code, § 351; see, e.g., Evid. Code §§ 952 [lawyer-client privilege], 1200 [hearsay].) The exception Honeywell raises in this appeal is set forth in Evidence Code section 352, which vests the trial court with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This exception to admissibility has not been interpreted to create hard and fast rules, but requires the trial court to complete a weighing process (i.e., probative value versus undue prejudice) that considers the unique facts and issues of the case. (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038 [228 Cal.Rptr. 768].)

The "undue prejudice" mentioned in Evidence Code section 352 refers to evidence which uniquely tends to evoke an emotional bias against the party as an individual and which has very little effect on the issues—it is not synonymous with "damaging." (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) In general, evidence is substantially more prejudicial than probative if it creates an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

The trial court's determination of undue prejudice is subject to review under the abuse of discretion standard. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147 [158 Cal.Rptr.3d 180].) When weighing probative value against the danger of prejudice, a trial court is deemed to have abused its discretion if its decision was arbitrary, capricious, or patently absurd and resulted in a manifest miscarriage of justice. (*Id.* at p. 150.) The circumstances the trial court may consider include whether the trial court believes, based on the particular facts, that the jury can follow a limiting instruction about how the evidence in question may be used. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 598 [103 Cal.Rptr.2d 492].) As a general rule, juries are presumed to follow a trial court's limiting instructions. (*Ibid.*) "Whether it would be impossible for a jury to follow limiting instructions is determined by the circumstances of each case, primarily in the trial court's discretion under Evidence Code section 352." (*Id.* at p. 599.)

### 7. *Analysis of Prejudice*

Honeywell argues that if the Martin letter was somehow relevant, it should have been excluded because of the danger of unfair prejudice. Honeywell contends the last paragraph of the Martin letter[18] "was so prejudicial, and bore so little relevance to the case, that is should have been excluded."

Honeywell supports its argument of undue prejudice by citing two appellate decisions in which the Martin letter was admitted into evidence and the appellate court ordered a new trial. (See *Guilder, supra*, 23 So.3d at p. 870 [prejudice from Martin letter was one ground for granting new trial]; *Dukes, supra*, 900 N.E.2d at pp. 1134–1135, 1138–1139 [error to allow entire Martin letter into evidence as an admission by Bendix].)

Plaintiffs argue (1) the Martin letter was relevant to the dispute about notice of the hazards of airborne asbestos, (2) the limiting instruction protected against the improper use of the Martin letter, (3) the arguments of Honeywell's counsel to the jury undermined the limiting instruction and invited the jury to consider it for other purposes, and (4) the out-of-state cases relied upon by Honeywell are distinguishable because, among other things, they did not involve California law or a limiting instruction.

In response, Honeywell argues that the analyses in *Guilder* and *Dukes* applied basic principles of prejudice that apply equally in California and the limiting "instruction did not come close to diminishing the tendency of the letter to inflame the passion and prejudice of the jury." Honeywell notes the court did not instruct the jury to disregard the sarcastic statement in the Martin letter and, by telling the jury to consider the letter on the issue of notice, erroneously implied that the last paragraph was relevant to that issue.

Honeywell has a difficult task in carrying its burden of affirmatively demonstrating the trial court prejudicially abused its discretion for two main reasons. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193] [appellants must affirmatively demonstrate error].) First, the abuse of discretion standard is a deferential standard of review. Second, Honeywell must overcome the presumption that juries follow limiting instructions.

Based on the circumstances of this case, we reach the following conclusions. First, contrary to Honeywell's argument, the last paragraph was relevant to the notice issues presented in this case. Second, the limiting

---

[18] That paragraph stated: "My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause."

instruction and other factors distinguish this case from the analysis of prejudice adopted in *Guilder* and *Dukes*. Third, Honeywell has failed to overcome the presumption that the jury followed the trial court's limiting instruction.

As to the relevancy of the last paragraph, we conclude the paragraph was relevant to the disputed issues in this case because it showed Martin understood the assertions about the potential health hazards of airborne asbestos because he comments, albeit sarcastically, on the claim that asbestos can cause death. In *Dukes*, the court stated that the Martin "letter is a revealing historical anecdote that may give us insight into the thinking within the asbestos industry in 1966, but it was irrelevant." (*Dukes, supra,* 900 N.E.2d at p. 1139.) Thus, the court recognized a trier of fact reasonably could infer from Martin's awareness of claims about health hazards related to asbestos that others working in the asbestos industry also were aware of the health claims. The court in *Dukes* was persuaded that "whatever probative value [the Martin letter] had was outweighed by its prejudicial effect." (*Ibid.*) This determination about probative value and prejudicial effect has little meaning outside the particular issues being litigated in *Dukes*. The decedent in that case had worked from 1954 to 1961 at a Union Asbestos & Rubber Company plant, but had never worked for Bendix and had never been exposed to asbestos from a Bendix product. (*Id.* at p. 1131.) The plaintiffs included Honeywell as a defendant on the theory that Bendix had engaged in a conspiracy with the other defendants. (*Ibid.*) They alleged the defendants had agreed to positively assert it was safe for people to work with asbestos and also had agreed to suppress information about the harmful effects of asbestos. (*Ibid.*) The plaintiffs also alleged the acts in furtherance of that conspiracy were a proximate cause of the decedent's illness and death. (*Ibid.*) The trial court allowed the Martin letter into evidence in its entirety as *an admission* by Bendix, which implies the trial court concluded the letter was evidence of the existence of a conspiracy. (*Id.* at p. 1135.)

The Illinois appellate court stated the Martin letter was "no more than a note from one business acquaintance to another and not an expression of corporate policy or proof of any conspiracy." (*Dukes, supra,* 900 N.E.2d at p. 1139.) Thus, the Martin letter was not offered in *Dukes* to show when Bendix became aware of claims that airborne asbestos was potentially hazardous to health, but was offered to support an inference that Bendix and its asbestos supplier, Johns-Manville, were engaged in a conspiracy to suppress information. The appellate court's determination that the Martin letter was irrelevant to proving a conspiracy does not bear directly on its relevance to the notice or awareness issue disputed in this case. Also, no limiting instruction was given in *Dukes*.

In the Florida case, the trial court denied Honeywell's motion in limine to exclude or redact the Martin letter. (*Guilder, supra,* 23 So.3d at p. 869.) The jury awarded damages of over $24 million to the plaintiff and his children. (*Ibid.*) On appeal, Honeywell argued the trial court erred by: (1) admitting the irrelevant, highly prejudicial Martin letter; (2) excluding nonparties from the verdict form that apportioned liability or fault among the entities who contributed to the injuries; and (3) allowing the children to recover for the loss of parental consortium. (*Ibid.*) As previously described, the appellate court in *Guilder,* like this court, concluded the Martin letter was relevant to the issue presented, stating: "Here, the Bendix employee's letter to an asbestos supplier written in the late 1960's was relevant to proving Honeywell's knowledge of the dangers of asbestos in its products." (*Id.* at p. 870.) The court then quoted the last paragraph of the Martin letter, found that portion was unfairly prejudicial, and concluded the trial court erred in refusing to redact that portion of the letter. (*Ibid.*) The court also agreed with Honeywell's other two claims of error, reversed the judgment, and remanded for a new trial. (*Id.* at p. 871.)

In *Guilder,* the plaintiff's exposure to asbestos occurred in the 1970's and 1980's. In contrast, Phillips first performed brake work in 1967, which increases the relevance (i.e., the probative value of the Martin letter), which affects one side of the scales in the weighing process (i.e., probative value versus undue prejudice) conducted under Evidence Code section 352. Furthermore, no limiting instruction was given in *Guilder.* These two factors are sufficient to distinguish *Guilder* and, along with our earlier analysis of the relevance of the last paragraph, lead us to conclude the trial court did not abuse its discretion by admitting the Martin letter into evidence.

### B. Expert Testimony on Causation

#### 1. Contentions of the Parties

Honeywell contends that the trial court erroneously allowed the jury to hear expert testimony on a speculative theory of causation. Honeywell argues that Dr. Brodkin's "every identified exposure" theory was indistinguishable for the every-exposure theory excluded by the trial court's ruling on a motion in limine.[19] In addition, Honeywell argues that Dr. Brodkin's testimony was inadmissible under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 [149 Cal.Rptr.3d 614, 288 P.3d 1237] (*Sargon*) and was legally invalid under *Rutherford, supra,* 16 Cal.4th 953.

Plaintiffs contend the trial court did not abuse its discretion by admitting Dr. Brodkin's opinion testimony about causation. They point out that the

---

[19] Other common labels for the every-exposure theory are the " 'any exposure' " theory and " 'any fiber' " theory. (*Davis, supra,* 245 Cal.App.4th at p. 480.)

Second District rejected Honeywell's very same argument in *Davis, supra,* 245 Cal.App.4th 477—another appeal involving Bendix brakes and a decedent who developed mesothelioma.

### 2. *Standard of Review*

Generally, a trial court's rulings relating to expert testimony is reviewed for an abuse of discretion. (*Sargon, supra,* 55 Cal.4th at p. 773.) In *Sargon,* the court stated: "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Ibid.;* cf. *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 [200 Cal.Rptr.3d 714] [abuse of discretion occurs when lower court exceeds the bounds of reason].) In addition, the trial court's discretion "must be exercised within the confines of the applicable legal principles." (*Sargon, supra,* at p. 773.)

■ One set of legal principles applicable to the admission of expert testimony provides for the exclusion of "expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon, supra,* 55 Cal.4th at pp. 771–772; see Evid. Code, §§ 801, 802.) Stated another way, "the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies." (*Sargon, supra,* at p. 772.)

■ Another applicable legal principle that confined the trial court's discretion is our Supreme Court's special rule for proving causation in cases alleging asbestos-related cancer. "[T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer." (*Rutherford, supra,* 16 Cal.4th at pp. 982–983.)

### 3. *Ruling on Motion in Limine*

Honeywell's third motion in limine requested an order precluding Dr. Brodkin "from presenting expert opinion testimony or argument that (1) each and every exposure to asbestos above so-called background levels, and (2) exposure to brake dust from Bendix brakes contributed to [Phillips's] mesothelioma." The trial court discussed the motion in limine with counsel and stated its "intention was to grant [regarding] the causation testimony of Carl Brodkin as it applied to the every contact theory."

Plaintiffs' counsel responded: "Yeah. I got to be real careful with this one, your Honor. [¶] I'm okay with that language. In other words, Mr.—or

Dr. Brodkin will not stand up and say, 'Each and every exposure to asbestos caused his mesothelioma.' He will not say that. That's not his testimony." Counsel further stated that "we will go in great detail on direct on these particular exposures [relating to Bendix and Calaveras Asbestos Ltd.] and at what level do these exposures increase one's risk and cause disease." After counsel's statements, the trial court said, "Defendants—so my narrow ruling on this is I'm excluding testimony about every exposure or an every exposure theory." This ruling amounts to a determination by the trial court that it would be conjecture (not a reasonable medical certainty) for an expert to testify that every exposure to asbestos was a substantial factor contributing to the risk of Phillips developing cancer.

### 4. *Dr. Brodkin's Testimony*

During direct examination, Dr. Brodkin was asked whether it is possible to separate an exposure from a series of identified exposures and say one did not have anything to do with the disease and another one caused it. Dr. Brodkin answered:

"No. There really isn't a scientifically valid way to do that, because in this case, the disease I came to diagnose was mesothelioma. That is what we call a dose-response disease. The greater the dose of asbestos, the greater the risk for a disease like mesothelioma.

"So the identified exposures result in an increase in the body's burden of asbestos. And it's the cumulative exposure, all of those exposures that result in disease risk in terms of the identified exposure.

"Now, there were many things in Mr. Phillips' history I did not identify. He had worked with installing boilers after 1974 that typically would not be asbestos-containing. He worked on valves and pumps in homes that were what we call ambient temperature. They weren't very hot. Those typically wouldn't be asbestos-containing.

"So many of his—the materials he worked with, I did not identify. But in terms of the identified asbestos exposures, they would each contribute to Mr. Phillips' cumulative exposure that resulted in a disease like mesothelioma."

The exposures to Bendix brakes identified by Dr. Brodkin were based on the deposition testimony of Phillips. They included (1) the regular exposures during the period (1969–1971) Phillips worked as an automotive mechanic and averaged about one brake job per week and (2) the intermittent exposures from 1967 through the 1980's when Phillips worked on his personal vehicles

and the vehicles of friends. Dr. Brodkin also considered how Phillips handled the brakes, how those activities created airborne asbestos, and what concentrations of airborne asbestos might be generated. Those activities included Phillips using an airhose to clean the residual brake dust from the brake drum, grinding the brakes with a hand file, and using sandpaper to edge the brakes and take off the glazing. Dr. Brodkin stated that Phillips's ability to see dust during his work was an indication of a very significant exposure, with a high concentration of asbestos per cubic foot of air.

Ultimately, Dr. Brodkin was asked whether Phillips's work with Bendix brakes over the course of his lifetime was a substantial contributing factor to the cause of his disease. Dr. Brodkin answered: "Yes, it would be. Because it's an important . . . component of his entire cumulative exposure to asbestos. . . . [H]e was doing this professionally, regularly for a two-year period. He was doing it intermittently for almost a 20-year period between the late '60s through the 1980s. So it's an important component part of his cumulative exposure, and as such is a substantial contributing factor in his development of mesothelioma."

Also, Dr. Brodkin was asked whether every time someone is exposed to asbestos that exposure is a substantial factor in causing a disease. He answered, "No." He explained his answer by stating: "I think the evidence strongly is against the notion that each and every asbestos fiber increases risk for disease. That's never been my opinion, and I don't think the science supports that. It takes significant exposures, for example, these exposures in an occupational setting, orders of magnitude higher than ambient levels, very high levels that overcome the body's defenses, add to the body's burden of asbestos that increases risk for disease."

Thus, Dr. Brodkin explicitly stated that his opinion was not based on an every-exposure theory.

### 5. *Distinction Between Every Exposure and Identified Exposures*

Honeywell describes the every-exposure theory of causation as stating that "every exposure to asbestos fibers is a substantial factor in causing disease, regardless of fiber type or dose, so long as the fibers are traceable to a product and are not merely 'background' fibers found in the ambient air." Honeywell contends that Dr. Brodkin's testimony about "every identified exposure" was the functional equivalent or indistinguishable from the every-exposure theory.

We reject Honeywell's argument that the every-exposure theory of causation is the equivalent of Dr. Brodkin's causation testimony about every

identified exposure. Our rejection of that argument is based on the content of Dr. Brodkin's testimony, which is quoted or described in the previous section. We need not repeat that testimony in detail as it speaks for itself in describing how the identified-exposure theory is a more rigorous standard of causation than the every-exposure theory. As a single example of the difference, we note Dr. Brodkin's statement that it "takes significant exposures" to increase the risk of disease. This statement uses the plural "exposures" and also requires that those exposures be "significant." The use of "significant" as a limiting modifier appears to be connected to Dr. Brodkin's earlier testimony about the concentrations of airborne asbestos created by particular activities done by Phillips, such as filing, sanding, and using an airhose to clean a brake drum.

The foregoing evaluation of Honeywell's arguments about the every-exposure theory is not unique. An appellate court in Ohio recently stated: "Contrary to Honeywell's position, Dr. Bedrossian's causation opinion was not premised on a rigid application of the 'each and every exposure' theory. Although some courts have rejected the 'each and every exposure' theory, others have distinguished testimony suggesting a de minimis exposure to asbestos could cause mesothelioma from testimony that each significant exposure to asbestos could be a cause. [Citation.]" (*Schwartz v. Honeywell Internat., Inc.* (Ct.App. 2016) 2016 Ohio 3175 [66 N.E.3d 118, 126].)

Similarly, the court in *Quirin v. Lorillard Tobacco Co.* (N.D.Ill. 2014) 23 F.Supp.3d 914, recognized a difference "between pointing to a minor exposure to asbestos and claiming causation in a conclusory fashion and identifying, through use of expert testimony, a significant and sustained exposure in the plaintiff's history." (*Id.* at p. 920; see *Robertson v. Doug Ashy Building Materials, Inc.* (La.Ct.App. 2014) 168 So.3d 556, 563 [trial court erred in excluding expert's testimony that each " 'special exposure' " to asbestos constituted a significant contributing factor in the development of decedent's mesothelioma and in prohibiting expert from giving definition to " 'special exposure' "].)

### 6. *Violation of Order Granting Motion in Limine*

As a second contention of trial court error, Honeywell states the trial "court should have granted [its] motion to strike Dr. Brodkin's 'every *identified* exposure' testimony because it advanced the every exposure theory under a different name and thereby violated the court's order" granting Honeywell's motion in limine.

Our conclusion that there is a legitimate distinction between the every-exposure theory and the identified-exposure theory of causation presented in

this case necessarily leads to the rejection of this contention. Honeywell asserts, in effect, that the trial court violated its own order on the motion in limine by allowing Dr. Brodkin's testimony about causation resulting from every identified exposure. Honeywell's interpretation of the court's order is not accurate. The court itself described its ruling granting the motion as "narrow." It is possible to interpret this narrowness as eliminating the every-exposure theory while still allowing Dr. Brodkin's testimony about the substantial, identified exposures that were experienced by Phillips.

Based on our conclusions that (1) Dr. Brodkin's opinion was not based on an every-exposure theory and (2) the trial court did not violate its own ruling by allowing that opinion testimony, we need not reach Honeywell's arguments that the analysis of the every-exposure theory adopted in *Davis* was wrong and should be rejected by this court.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Hill, P. J., and Gomes, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 14, 2017, S241544.

---

*See footnote, *ante*, page 1061.